UNITED STATE DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

THE DWYER LAW FIRM, L.L.C.
17 Academy Street, Suite 1010
Newark, New Jersey 07102
(973) 242-3636
Andrew Dwyer (AD-7793)
Attorneys for Plaintiff

|  |  |  |
|---|---|---|
| STEVE BIEGEL, | : | Hon. Colleen McMahon, U.S.D.J. |
|  | : | Civil Action No. 07-9653 (CM) (THK) |
| Plaintiff, |  |  |
|  | : |  |
| v. | : |  |
| DENTSU HOLDINGS USA, INC.,<br>DENTSU AMERICA, INC.,<br>TOYO SHIGETA and<br>TIMOTHY ANDREE, | : | **AMENDED COMPLAINT AND**<br>**JURY DEMAND** |
|  | : |  |
| Defendants. | : |  |

## I.    PRELIMINARY STATEMENT

1.    This is an action for unlawful discrimination and retaliation in employment, based on the employer's discriminatory and harassing conduct, and based on the discriminatory and retaliatory termination of plaintiff's employment. The Amended Complaint adds further claims for retaliation and defamation, based on additional retaliatory actions defendants undertook in response to plaintiff's assertion of claims.

1

## II.  JURISDICTION AND VENUE

2.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the complaint states a cause of action arising under federal law.  Jurisdiction over plaintiff's pendent state law claims is invoked pursuant to 28 U.S.C. § 1367.

3.    Venue is appropriate in the Southern District of New York pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York and because the corporate defendants both "reside" in the Southern District of New York within the meaning of 28 U.S.C. § 1391.

## III.  PARTIES

4.    Plaintiff Steve Biegel is a citizen of the State of New York residing in Woodbury, New York.

5.    Defendant Dentsu Holdings USA, Inc. (hereinafter "Dentsu Holdings"), upon information and belief, is a Delaware Corporation, with its headquarters and principal place of business located at 32 Avenue of the Americas, 16th Floor, New York, New York.  Dentsu Holdings was formerly known as DCA Advertising, Inc.

6.    Defendant Dentsu America, Inc. (hereinafter "Dentsu America"), upon information and belief, is a wholly owned subsidiary of Dentsu Holdings, with its headquarters and principal place of business located at 32 Avenue of the Americas, 16th Floor, New York, New York.

2

7.    In this Amended Complaint Dentsu Holdings and Dentsu America are sometimes referred to collectively as "Dentsu".

8.    Defendant Toyo Shigeta is currently the CEO of Dentsu Holdings, and resides at 217 Orchard Place, Ridgewood, New Jersey. During a portion of the time covering the events described herein, defendant Shigeta was the President and CEO of defendant Dentsu America. Defendant Shigeta is sued in both his individual and representative capacity.

9.    Defendant Timothy Andree is currently the CEO of defendant Dentsu America, and resides at 26 Raven Road, Colts Neck, New Jersey. Defendant Andree is sued in both his individual and representative capacity.

## IV. FACTUAL ALLEGATIONS

10.    Dentsu Holdings and Dentsu America are part of a Japanese corporation that is the largest advertising agency in the world.

11.    Plaintiff began working on a freelance basis for Dentsu America in 2003, and ultimately became a salaried employee of Dentsu America starting on May 1, 2003.

12.    Plaintiff was hired as the Creative Director for Dentsu America, the position he held until his termination on November 17, 2006. Plaintiff's official title was Senior Vice President, Group Creative Director.

13.    As the Creative Director, plaintiff reported directly to Ronald J. Rosen, whose title was the Executive Creative Director for Dentsu America.

14.    Mr. Rosen, in turn, reported directly to defendant Shigeta, who was the President and CEO of Dentsu America at the time.

3

15.    Plaintiff and Mr. Rosen are both Jewish and native born Americans, facts that were known to defendant Shigeta, as well as other members of management at Dentsu.

16.    In his capacity as Creative Director, plaintiff was responsible for developing television, radio, print and outdoor advertisements for many of Dentsu's most important clients, such as Canon Consumer Integrated Group and Toyota Corporate. In this capacity, plaintiff was required regularly to work closely with defendant Shigeta.

17.    Plaintiff always performed his work in an exemplary manner, and consistently met or exceeded all of his employer's legitimate expectations. Plaintiff's advertisements were incredibly successful, both winning the Company industry awards (such as Effies) and generating millions of dollars of revenue.

18.    In or about June, 2004, plaintiff was required to travel for work to Prague, in the Czech Republic. This trip was held in order to shoot scenes for a commercial for one of Dentsu's largest clients, Canon, Inc.

19.    Attending the trip, along with plaintiff, was a producer, Scott Weitz. Mr. Weitz is also Jewish, a fact that was known to defendant Shigeta as well as other members of Dentsu management.

20.    Also in attendance on the trip was defendant Shigeta.

21.    One evening during the trip, defendant Shigeta approached plaintiff and Mr. Weitz, and informed them that they were going to go out. Defendant Shigeta refused to tell them where they were going. It was clear

4

that defendant Shigeta was ordering plaintiff and Mr. Weitz to go with him, and the "outing" was not optional.

22.    Plaintiff, Mr. Weitz and defendant Shigeta got into a car hired by defendant Shigeta, and went to a location selected by defendant Shigeta, which initially appeared to be a bar or restaurant.  The name of the establishment was "Escade."  Escade maintains a web site at www.escade.cz.  Certain photographs and information from the Escade web site, which accurately reflect what type of establishment it is, have been previously annexed as **Exhibit A** to the original Complaint filed in this action.

23.    In particular, Escade is a brothel.  Indeed, it explicitly offers prostitution as a "service" provided on the premises, which are equipped with rooms where customers can have sex with the prostitutes employed by the brothel.  As it states on the website, it is even possible to "buy" a "lady companion" for "all night."

24.    When plaintiff, Mr. Weitz and defendant Shigeta arrived at Escade, plaintiff and Mr. Weitz were shocked to discover that defendant Shigeta had taken them to a brothel.  Plaintiff, who is married, was offended and humiliated that he had been forced/duped into going to a brothel as a condition of his employment with defendants.

25.    While at the brothel, defendant Shigeta (who is also married), proceeded to mingle with the various prostitutes at the brothel.

26.    Defendant Shigeta noticed that plaintiff and Mr. Weitz were refusing to participate in the prostitution, and were instead sitting by

themselves away from the activity of the brothel.  Defendant Shigeta came

over to them and demanded that they participate in the prostitution and that

they select a prostitute with whom to have sex.  Plaintiff and Mr. Weitz (who is

also married) declined, explaining that they did not want to have sex with the

prostitutes.

27.    In addition to being incredibly offended and humiliated by this

outrageous spectacle, plaintiff was also very uncomfortable.  Defendant

Shigeta was the head of the company, and the direct superior of plaintiff's

direct superior.  Defendant Shigeta was easily offended by any perceived

failure to accord him proper "respect," so plaintiff was extraordinarily careful to

turn down defendant Shigeta's demand that plaintiff debase himself sexually

in as polite a fashion as circumstances would permit.  Nonetheless, defendant

Shigeta became incredibly angry at plaintiff and Mr. Weitz, accused them of

being "no fun," and stormed off.

28.    Unfortunately, this did not end the matter, because shortly

thereafter defendant Shigeta returned with five or six prostitutes.  Again,

defendant Shigeta demanded that plaintiff and Mr. Weitz select a prostitute

with whom to have sex.  They again declined his demand, politely but firmly.

Defendant Shigeta then simply selected two prostitutes for his two

subordinates, by pointing at two prostitutes and then at plaintiff and Mr. Weitz,

stating, "You - him!  You -- him!"

29.    Upon information and belief, defendant Shigeta paid for the

prostitutes at Escade, but plaintiff does not know whether defendant Shigeta

6

paid for them out of his own personal funds, or whether instead he paid for them using a Dentsu corporate credit card.

30.     Thus paired with his prostitute, plaintiff was then told to go to one of the rooms where customers were to have sex with the brothel's employees. However, once there plaintiff refused to engage in any form of sexual or other intimate activity with the prostitute, and refused to take off his clothes. Instead, plaintiff waited a decent interval and then left the room and returned to the main area of the brothel.

31.     Mr. Weitz subsequently informed plaintiff that he, too, had refused to engage in any sexual activity with the prostitute selected for him by defendant Shigeta. Defendant Shigeta, upon information and belief, did have sex with the prostitute he had selected for himself.

32.     Apparently, defendant Shigeta maintained that having sex with prostitutes was a "Japanese" style of conducting business. For example, defendant Shigeta once told plaintiff (as well as Ronald Rosen and Douglas Fidoten) that he and another Japanese businessman sealed a deal not with a handshake, but by hiring a prostitute in Mexico and having "double penetration" sex with her -- i.e., where both businessmen had sex with the same prostitute at the same time. Defendant Shigeta explained to plaintiff that having "double penetration" sex was a way in which Japanese businessmen would commemorate business dealings.

33.    Plaintiff was horrified, offended and humiliated by this sexually debasing experience of being forced to attend a brothel imposed on him as a condition of his employment.

34.    This was not the only instance, unfortunately, when defendant Shigeta injected his sexual obsessions into the work required for Dentsu. For example, on another business trip with defendant Shigeta to Brazil, in April, 2004, plaintiff witnessed defendant Shigeta repeatedly taking photographs of scantily clad women on the beach, repeatedly focusing his camera on the women's crotches, for example when they were bent over and not looking. Apparently, taking close up crotch shots of women is a personal obsession of defendant Shigeta. On this occasion, defendant Shigeta's behavior was so offensive that a male companion of one of the women on the beach almost physically attacked him, which was only prevented by the intervention of plaintiff.

35.    Defendant Shigeta demonstrated this particular obsession on another occasion, during a photo shoot for an advertisement for Canon. This occurred at the Nasdaq Center in Key Biscayne, Florida. The personality for this advertisement campaign was the tennis star, Maria Sharapova. Plaintiff was present, because as the Creative Director he was overseeing this advertisement campaign for Canon. This particular photo shoot occurred on a tennis court, where Ms. Sharapova was playing tennis, as part of the shoot. Defendant Shigeta was also present, and had his own camera with him. During a break in the shoot, without her knowledge or consent, defendant

Shigeta used a telephoto lens to take a "crotch shot" of Ms. Sharapova. Although Ms. Sharapova was not aware defendant Shigeta had done this, plaintiff saw it, as did Ms. Sharapova's make up artist, Maital Sabban. Defendant Shigeta was very proud of this "crotch shot" he had sneakily obtained of Ms. Sharapova, and he proudly gave plaintiff an electronic copy of the photo. A copy of the photograph was annexed as **Exhibit B** to the original Complaint in this action. This incident occurred in or about April, 2005. Plaintiff is not sure whether Ms. Sharapova was seventeen or eighteen years old at the time. To plaintiff's knowledge, neither Ms. Sharapova, nor her manager Max Eisenbud, nor Canon's Managing Director, Yoroku Adachi, were aware that defendant Shigeta saw fit to take this photograph during the shoot.

36.    Being subjected to sexual humiliation on Dentsu business trips, unfortunately, continued for plaintiff. In October, 2004, plaintiff was required to attend another business trip, this time to Tokyo, Japan. Also on the trip were Ronald Rosen, Douglas Fidoten, and defendant Shigeta. At the time, Mr. Fidoten was an account executive for Dentsu. Like Mr. Rosen and plaintiff, Mr. Fidoten is also Jewish, a fact that was known to defendant Shigeta. Defendant Shigeta's supervisor in Japan, "Ted" Machida, also attended some of the events during this business trip.

37.    During this trip, as in Prague, one evening defendant Shigeta simply announced that the four of them were going out, and did not say where they were going. Once again, plaintiff was in an uncomfortable position,

9

because the head of the company was ordering him to go on an outing as a condition of his employment, but he did not know where he was going.

38.    This time, defendant Shigeta took plaintiff and his co-workers to a Japanese bath house. When they arrived, defendant Shigeta took the men to a locker room and told them they were going to take a bath together. Plaintiff did not want to take a bath with defendant Shigeta, and told him so, but defendant Shigeta insisted, "yes, you will." Plaintiff did not understand what he was supposed to do, but defendant Shigeta then instructed him: "get naked!" Having given this command, defendant Shigeta abruptly left the room. Somewhat disoriented and confused, plaintiff, Mr. Rosen and Mr. Fidoten understood that they were supposed to take off their clothes and follow the path that defendant Shigeta had taken. Once again, plaintiff was humiliated and offended by this coercive conduct, but he was also afraid that he would suffer some kind of adverse action if he challenged defendant Shigeta's authority. Plaintiff, Mr. Rosen and Mr. Fidoten thus attempted to follow defendant Shigeta. In doing so, defendant Shigeta effectively led them through a room, where they were required to parade naked in front of several other men. (None of the three Americans had a towel to cover themselves, although it turned out defendant Shigeta did.) Eventually, the three men arrived naked at a bath where defendant Shigeta was already situated. They were then expected to climb naked into the bath with defendant Shigeta. To do this, each of the men also had to parade naked in front of defendant Shigeta. It was obvious from his expression that defendant Shigeta enjoyed

10

subjecting plaintiff and the others to this humiliating spectacle. Once again, plaintiff was offended and humiliated by this outrageous, sexually degrading experience imposed on him as a condition of his employment.

39.    In May or June, 2006, plaintiff learned that another Dentsu employee, Neal Gomberg (who is also Jewish), was possibly going to go on a business trip with defendant Shigeta in Tokyo, Japan. Recalling what had happened to him on his business trips with defendant Shigeta, plaintiff became concerned that defendant Shigeta would subject Mr. Gomberg to a similarly sexually humiliating and degrading experience.

40.    Therefore, plaintiff approached defendant Shigeta about the anticipated trip with Mr. Gomberg. Plaintiff urged defendant Shigeta not to take Mr. Gomberg to the bath house, or on any similar "outing." Plaintiff explained to defendant how humiliated he was by that experience, and told defendant Shigeta that he had almost complained to human resources about the incident, and in particular about defendant Shigeta's conduct in forcing plaintiff to parade about naked in front of him.

41.    In response, defendant Shigeta became very angry about the threat to report him to human resources for the sexually humiliating and degrading treatment he had accorded plaintiff. Defendant Shigeta told plaintiff that had he complained to human resources, defendant Shigeta would have arranged to have him fired. Defendant Shigeta further threatened plaintiff, telling him that if he ever did register such a complaint with human resources, defendant Shigeta would see to it that he would be fired.

11

42.    Subsequent to this conversation, defendant Shigeta's attitude and demeanor toward plaintiff changed completely and abruptly. Previously, defendant Shigeta worked regularly and closely with plaintiff, and dealt with plaintiff on a regular basis. Further, defendant Shigeta's demeanor toward plaintiff had been generally positive.

43.    However, following plaintiff's complaint about defendant Shigeta's sexually inappropriate conduct, defendant Shigeta's attitude toward plaintiff changed completely and for the worse. Defendant Shigeta cut off nearly all communication with plaintiff. He would no longer take or return phone calls, and despite repeated attempts by plaintiff, defendant Shigeta refused to meet with plaintiff about business, or even to return his phone calls. Likewise, defendant Shigeta cut off email communication and would no longer respond to plaintiff's emails or communicate with plaintiff by email. Last but not least, defendant Shigeta pointedly refused to talk to plaintiff. For example, when defendant Shigeta was physically in the same office suite where plaintiff worked, plaintiff would attempt to engage defendant Shigeta in conversation, even calling out to him. However, defendant Shigeta would abruptly walk away, and simply refuse to speak with plaintiff. From defendant Shigeta's demeanor and behavior, from the threatening retaliatory comments he made to plaintiff when plaintiff complained, and from the timing of these events, it was obvious that defendant Shigeta was extremely angry at plaintiff for the complaint he had made about defendant Shigeta's behavior.

44.     Shortly after plaintiff's complaint to defendant Shigeta about the latter's sexually inappropriate conduct, defendant Shigeta was promoted to become the CEO of Dentsu Holdings. In turn, defendant Andree was appointed as the CEO of Dentsu America to replace defendant Shigeta. From this point forward, defendant Andree reported directly to defendant Shigeta.

45.     Upon information and belief, almost as soon as defendant Andree was made CEO of Dentsu America, defendants made the decision to fire plaintiff, in retaliation for the complaints he had made to defendant Shigeta about the latter's sexually inappropriate conduct. Upon information and belief, both defendant Shigeta and defendant Andree were involved in the decision to fire plaintiff.

46.     Although they made the decision to fire plaintiff almost as soon as defendant Andree was made the CEO of Dentsu America, defendants did not inform plaintiff of the decision, nor effectuate it, because they wanted to first find a replacement for plaintiff as Creative Director. Upon information and belief, defendants ordered Ronald Rosen, plaintiff's immediate supervisor, to begin looking for a replacement for plaintiff. Upon information and belief, because Mr. Rosen did not believe plaintiff deserved to be fired, he did not proceed expeditiously to find plaintiff's replacement, although some candidates were interviewed. The fact that Mr. Rosen did not move quickly enough to find plaintiff's replacement so he could be fired angered defendants.

47.    On November 17, 2006, defendants abruptly fired both plaintiff and Mr. Rosen.

48.    Upon information and belief, Mr. Rosen was replaced by Michael Wilson, who is not Jewish.

49.    The foregoing conduct and statements are only examples of the sexual harassment to which plaintiff has been subjected, and they do not constitute every instance of sexual harassment that plaintiff has suffered.

50.    The conduct of defendants encompass the foregoing acts as well as other unlawful acts of harassment.

51.    Plaintiff was the unwilling target of repeated, sexually charged and gender based actions and statements.

52.    The defendants' sexually harassing conduct and statements were unwelcome and offensive to plaintiff.

53.    Plaintiff was upset, offended, humiliated and embarrassed by defendants' sexually harassing conduct and statements.

54.    Defendants' actions and statements were of a sexual nature.

55.    Defendants' actions and statements were intended to humiliate, embarrass and intimidate plaintiff as a man.

56.    Defendants' actions and statements intruded upon plaintiff's sexual privacy.

57.    The sexual harassment directed at plaintiff highlighted plaintiff's gender, and used plaintiff's gender to embarrass, humiliate and intimidate him.

14

58.    Plaintiff was forced to endure sexual harassment as a condition of his employment.

59.    The harassment to which plaintiff was subjected is sexual in nature and thus inseparable from plaintiff's gender.

60.    The sexual harassment to which plaintiff was subjected would not have occurred but for plaintiff's gender.

61.    The sexually harassing actions and statements directed at plaintiff were severe and pervasive.

62.    The sexually harassing actions and statements directed at plaintiff altered the conditions of plaintiff's employment and have created an intimidating, hostile, offensive and abusive working environment because of plaintiff's gender.

63.    A reasonable man and a reasonable person would consider the actions and statements directed toward plaintiff to have created an intimidating, hostile, offensive and abusive working environment because of gender.

64.    By subjecting plaintiff to a hostile work environment, defendants caused plaintiff to suffer profound emotional distress.  Plaintiff has suffered loss of sleep, anxiety, stress, weight loss, chest pains, high blood pressure, anxiety, difficulty concentrating, depression, pain and suffering, and disruption of family and social relationships.

65.    Defendants have known or should have known that their actions and statements have caused severe emotional distress to plaintiff.

15

66.    Defendants and their agents and supervisors, have known or should have known that plaintiff was subject to harassment and discrimination.

67.    Upon information and belief, defendants have no effective policy or remedial scheme for sexual harassment in the workplace, which would provide protection or remediation for plaintiff.

68.    Defendants have never taken any effective action to address plaintiff's complaints.

69.    Defendants have retaliated against plaintiff for his complaints.

70.    By their inaction, failure to respond and retaliation against plaintiff, defendants have condoned the sexual harassment of plaintiff.

71.    By their actions and statements, defendants have sexually harassed plaintiff.

72.    By their actions, defendants have created and maintained a sexually hostile work environment to which they have subjected plaintiff on account of his gender.

73.    The acts of the individual defendants described herein have been committed within the scope of their employment.

74.    Defendants Dentsu Holdings and Dentsu America have delegated to defendants Shigeta and Andree the authority to control the work environment of plaintiff.

75.    Defendants Shigeta and Andree have abused the authority delegated by defendants Dentsu Holdings and Dentsu America when they created and maintained a sexually hostile work environment for plaintiff.

76.    Defendants Dentsu Holdings and Dentsu America are strictly liable for the actions of the other defendants in creating and maintaining a hostile work environment to which plaintiff has been subjected.

77.    Defendants Dentsu Holdings and Dentsu America are vicariously liable for the actions of the other defendants in creating and maintaining a hostile work environment to which plaintiff has been subjected.

78.    Defendants Dentsu Holdings and Dentsu America have been negligent in failing to maintain an effective mechanism for preventing, monitoring and correcting sexual harassment in plaintiff's work environment.

79.    Defendants Dentsu Holdings and Dentsu America have been negligent in failing to have or to maintain an effective and well-publicized structure for handling and responding to complaints of sexual harassment.

80.    Defendants Dentsu Holdings and Dentsu America have had actual and/or constructive knowledge of the sexual harassment of plaintiff, but they have failed and refused to take appropriate and effective steps to rectify the situation.

81.    Defendants Dentsu Holdings and Dentsu America have acted with willful indifference to the sexual harassment to which plaintiff has been subjected.

82.    Defendants Dentsu Holdings and Dentsu America have acted with willful indifference and reckless disregard to plaintiff's complaints of sexual harassment.

83.    Defendants Dentsu Holdings and Dentsu America have authorized, participated in and/or ratified or condoned the sexual harassment against plaintiff.

84.    The actions of defendants described herein have a malicious and egregious motive.

85.    The foregoing conduct of defendants is willful and intentional and evidences defendants' reckless and/or callous indifference.

86.    The acts of defendants have been intentional and willful and are motivated by actual malice and ill will.

87.    The acts of defendants were meant to cause, or caused in a gross or reckless manner, egregious and unjustified harm to plaintiff.

88.    Defendants have acted in bad faith.

89.    Defendants have acted with wanton recklessness and/or reckless indifference.

90.    As a result of defendants' unlawful conduct, plaintiff has suffered and continues to suffer personal hardships, including economic loss, stigma, physical and emotional distress, pain and suffering, humiliation, career, family and social disruption and other grievous harm.

91.    By the foregoing conduct, defendants have discriminated against plaintiff on the basis of sex.

18

92.    By complaining about the sexually inappropriate conduct of defendant Shigeta, and threatening to bring the complaint to human resources, plaintiff was engaged in protected activity, known to defendants.

93.    Defendants retaliated against plaintiff, by firing him for his complaints and protected activity.

94.    In or about December, 2006, a draft copy of the original Complaint in this action was sent to the defendants in this action, with a cover letter advising them that plaintiff intended to file the Complaint.

95.    Subsequently, this action was filed with this Court, on or about October 31, 2007.

96.    In addition, plaintiff also filed a related charge of discrimination against defendants with the Equal Employment Opportunity Commission, which is still pending.

97.    In asserting these claims against defendants, plaintiff was engaged in protected activity, known to defendants, under both the federal, state and local civil rights laws.

98.    In response to plaintiff engaging in this protected activity, defendants have further retaliated against plaintiff, by defaming him, and by attempting to injure his personal, professional and business reputation.

99.    Among other things, defendants have publicly accused plaintiff of fraud, and have also publicly attacked plaintiff's professional competence.

100.    These statements were false and defamatory, and were widely published to the public by defendants.

101.   Upon information and belief, defendants have made other false, defamatory statements regarding plaintiff.

102.   These defamatory statements have caused injury to plaintiff, including injury to his personal, professional and business reputation.

103.   By the foregoing conduct, defendants have retaliated against plaintiff.

104.   Plaintiff's firing was also discriminatory, in that plaintiff was fired in part because he is Jewish.

105.   By the foregoing conduct, defendants Shigeta and Andree have aided and abetted defendants Dentsu Holding and Dentsu America in the sexual harassment of plaintiff and in the creation and maintenance of a hostile work environment for plaintiff on account of his gender; in the retaliation against plaintiff; and in the discrimination against plaintiff.

106.   There is no fully adequate remedy at law.

107.   By the foregoing conduct, defendants have created and maintained a sexually hostile work environment on the basis of plaintiff's gender.

108.   By the foregoing conduct, defendants have unlawfully retaliated against plaintiff.

109.   By the foregoing conduct, defendants have discriminated against plaintiff because he is Jewish.

110.   By the foregoing conduct, defendants have defamed plaintiff.

111.  At or before the commencement of the initial action, notice thereof was provided to the Attorney General of the State of New York, as provided by N.Y. Civ. Rights Laws, § 40-d.

112.  Prior to the commencement of the initial action, a copy of the original Complaint was served upon the New York City Commission on Human Rights and the New York City Corporation Counsel, as provided by the New York City Human Rights Law, N.Y.C. Admin. Code § 8-502(c).

113.  Plaintiff also filed separately a charge with the Equal Employment Opportunity Commission, and is amending that charge to include the additional claims of retaliation.  Once plaintiff obtains a "right to sue" letter from the EEOC, he will seek to amend this Complaint to add further causes of action under Title VII of the Civil Rights Act of 1964.

## FIRST CAUSE OF ACTION

114.  Defendants' conduct constitutes a violation of the New York State Human Rights Law.

## SECOND CAUSE OF ACTION

115.  Defendants' conduct constitutes a violation of the New York City Human Rights Law.

## THIRD CAUSE OF ACTION

116.  Defendants' conduct constitutes a violation of 42 U.S.C. § 1981.

## FOURTH CAUSE OF ACTION

117.  Defendants' conduct constitutes common law defamation.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Steve Biegel demands judgment and an order:

A.   Awarding compensatory damages for all economic loss,
including but not limited to back pay, front pay, bonuses,
incentive pay, overtime and all other benefits to which he is
entitled;

B.   Awarding compensatory damages for all other economic loss,
physical and emotional distress, anxiety, humiliation, emotional
harm, pain and suffering, career, family and social disruption and
other grievous harm;

C.   Awarding compensatory damages for all harm caused to
plaintiff's personal, professional and business reputation;

D.   Awarding punitive damages;

E.   Awarding costs and disbursements of this suit, including
reasonable attorney's fees;

F.   Awarding pre-judgment interest; and

G.   Awarding such other and further relief as this Court deems just
and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all actions triable to a jury.

Respectfully submitted,

THE DWYER LAW FIRM, L.L.C.
Attorneys for Plaintiff

By:

Andrew Dwyer (AD 7793)

Dated: 11/16/07

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of November, 2007, I arranged

that a true and correct copy of the within Amended Complaint and Jury

Demand be served via regular first class mail, postage prepaid, on defense

counsel at their last known address:

> Howard J. Rubin
> Davis & Gilbert, LLP
> 1740 Broadway
> New York, New York 10019
> Attorneys for Defendants

Andrew Dwyer

Dated: November 16, 2007

24