# EXHIBIT A

US EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

NEW YORK DISTRICT OFFICE

THE DWYER LAW FIRM, L.L.C.
17 Academy Street, Suite 1010
Newark, New Jersey 07102
(973) 242-3636
Andrew Dwyer
Attorneys for Charging Party, Steve Biegel

---

STEVE BIEGEL,

    Charging Party,

v.

DENTSU HOLDINGS USA, INC.,
DENTSU AMERICA, INC.,
TOYO SHIGETA and
TIMOTHY ANDREE,

    Respondents.

Charge No. 520-2007-04432

**AMENDED CHARGE OF DISCRIMINATION**

---

    1.    This is a charge of unlawful discrimination and retaliation in employment, based on the employer's discriminatory and harassing conduct, and based on the discriminatory and retaliatory termination of plaintiff's employment. This Amended Charge of Discrimination adds further claims for retaliation, based on additional retaliatory actions defendants undertook in response to the charging party's assertion of claims against respondents.

    2.    Steve Biegel is a citizen of the State of New York residing in Woodbury, New York.

1

3. Dentsu Holdings USA, Inc. (hereinafter "Dentsu Holdings"), upon information and belief, is a Delaware Corporation, with its headquarters and principal place of business located at 32 Avenue of the Americas, 16th Floor, New York, New York. Dentsu Holdings was formerly known as DCA Advertising, Inc.

4. Dentsu America, Inc. (hereinafter "Dentsu America"), upon information and belief, is a wholly owned subsidiary of Dentsu Holdings, with its headquarters and principal place of business located at 32 Avenue of the Americas, 16th Floor, New York, New York.

5. Toyo Shigeta is currently the CEO of Dentsu Holdings, and resides at 217 Orchard Place, Ridgewood, New Jersey. During a portion of the time covering the events described herein, Shigeta was the President and CEO of defendant Dentsu America.

6. Timothy Andree is currently the CEO of Dentsu America, and resides at 26 Raven Road, Colts Neck, New Jersey.

7. Dentsu Holdings and Dentsu America are part of a Japanese corporation that is the largest advertising agency in the world.

8. Biegel began working on a freelance basis for Dentsu America in 2003, and ultimately became a salaried employee of Dentsu America starting on May 1, 2003.

9. Biegel was hired as the Creative Director for Dentsu America, the position he held until his termination on November 17, 2006. Biegel's official title was Senior Vice President, Group Creative Director.

10. As the Creative Director, Biegel reported directly to Ronald J. Rosen, whose title was the Executive Creative Director for Dentsu America.

11. Mr. Rosen, in turn, reported directly to Shigeta, who was the President and CEO of Dentsu America at the time.

12. Biegel and Mr. Rosen are both Jewish and native born Americans, facts that were known to Shigeta, as well as other members of management at Dentsu.

13. In his capacity as Creative Director, Biegel was responsible for developing television, radio, print and outdoor advertisements for many of Dentsu's most important clients, such as Canon Consumer Integrated Group and Toyota Corporate. In this capacity, Biegel was required regularly to work closely with Shigeta.

14. Biegel always performed his work in an exemplary manner, and consistently met or exceeded all of his employer's legitimate expectations. Biegel's advertisements were incredibly successful, both winning the Company industry awards (such as Effies) and generating millions of dollars of revenue.

15. In or about June, 2004, Biegel was required to travel for work to Prague, in the Czech Republic. This trip was held in order to shoot scenes for a commercial for one of Dentsu's largest clients, Canon, Inc.

16. Attending the trip, along with Biegel, was a producer, Scott Weitz. Mr. Weitz is also Jewish, a fact that was known to Shigeta as well as other members of Dentsu management.

17. Also in attendance on the trip was Shigeta.

18. One evening during the trip, Shigeta approached Biegel and Mr. Weitz, and informed them that they were going to go out. Shigeta refused to tell them where they were going. It was clear that Shigeta was ordering Biegel and Mr. Weitz to go with him, and the "outing" was not optional.

19. Biegel, Mr. Weitz and Shigeta got into a car hired by Shigeta, and went to a location selected by Shigeta, which initially appeared to be a bar or restaurant. The name of the establishment was "Escade."

20. In fact, Escade is a brothel. Indeed, it explicitly offers prostitution as a "service" provided on the premises, which are equipped with rooms where customers can have sex with the prostitutes employed by the brothel. As it states on the website, it is even possible to "buy" a "lady companion" for "all night."

21. When Biegel, Mr. Weitz and Shigeta arrived at Escade, Biegel and Mr. Weitz were shocked to discover that Shigeta had taken them to a brothel. Biegel, who is married, was offended and humiliated that he had been forced/duped into going to a brothel as a condition of his employment.

22. While at the brothel, Shigeta (who is also married), proceeded to mingle with the various prostitutes at the brothel.

23. Shigeta noticed that Biegel and Mr. Weitz were refusing to participate in the prostitution, and were instead sitting by themselves away from the activity of the brothel. Shigeta came over to them and demanded that they participate in the prostitution and that they select a prostitute with

4

whom to have sex. Biegel and Mr. Weitz (who is also married) declined, explaining that they did not want to have sex with the prostitutes.

24. In addition to being incredibly offended and humiliated by this outrageous spectacle, Biegel was also very uncomfortable. Shigeta was the head of the company, and the direct superior of Biegel's direct superior. Shigeta was easily offended by any perceived failure to accord him proper "respect," so Biegel was extraordinarily careful to turn down Shigeta's demand that Biegel debase himself sexually in as polite a fashion as circumstances would permit. Nonetheless, Shigeta became incredibly angry at Biegel and Mr. Weitz, accused them of being "no fun," and stormed off.

25. Unfortunately, this did not end the matter, because shortly thereafter Shigeta returned with five or six prostitutes. Again, Shigeta demanded that Biegel and Mr. Weitz select a prostitute with whom to have sex. They again declined his demand, politely but firmly. Shigeta then simply selected two prostitutes for his two subordinates, by pointing at two prostitutes and then at Biegel and Mr. Weitz, stating, "You - him! You -- him!"

26. Upon information and belief, Shigeta paid for the prostitutes at Escade, but Biegel does not know whether Shigeta paid for them out of his own personal funds, or whether instead he paid for them using a Dentsu corporate credit card.

27. Thus paired with his prostitute, Biegel was then told to go to one of the rooms where customers were to have sex with the brothel's employees. However, once there Biegel refused to engage in any form of sexual or other

5

intimate activity with the prostitute, and refused to take off his clothes. Instead, Biegel waited a decent interval and then left the room and returned to the main area of the brothel.

28. Mr. Weitz subsequently informed Biegel that he, too, had refused to engage in any sexual activity with the prostitute selected for him by Shigeta. Shigeta, upon information and belief, did have sex with the prostitute he had selected for himself.

29. Biegel was horrified, offended and humiliated by this sexually debasing experience of being forced to attend a brothel imposed on him as a condition of his employment.

30. This was not the only instance, unfortunately, when Shigeta injected his sexual obsessions into the work required for Dentsu. For example, on another business trip with Shigeta to Brazil, in April, 2004, Biegel witnessed Shigeta repeatedly taking photographs of scantily clad women on the beach, repeatedly focusing his camera on the women's crotches, for example when they were bent over and not looking.

31. Shigeta demonstrated this particular obsession on another occasion, during a photo shoot for an advertisement for Canon. This occurred at the Nasdaq Center in Key Biscayne, Florida. The personality for this advertisement campaign was the tennis star, Maria Sharapova. Biegel was present, because as the Creative Director he was overseeing this advertisement campaign for Canon. This particular photo shoot occurred on a tennis court, where Ms. Sharapova was playing tennis, as part of the shoot.

Shigeta was also present, and had his own camera with him. During a break in the shoot, without her knowledge or consent, Shigeta used a telephoto lens to take a "crotch shot" of Ms. Sharapova. Although Ms. Sharapova was not aware Shigeta had done this, Biegel saw it, as did Ms. Sharapova's make up artist, Maital Sabban. Shigeta was proud of this "crotch shot" he had sneakily obtained of Ms. Sharapova, and he gave Biegel an electronic copy of the photo. This incident occurred in or about April, 2005.

32.   Being subjected to sexual humiliation on Dentsu business trips, unfortunately, continued for Biegel. In October, 2004, Biegel was required to attend another business trip, this time to Tokyo, Japan. Also on the trip were Ronald Rosen, Douglas Fidoten, and Shigeta. At the time, Mr. Fidoten was an account executive for Dentsu. Like Mr. Rosen and Biegel, Mr. Fidoten is also Jewish, a fact that was known to Shigeta. Shigeta's supervisor in Japan, "Ted" Machida, also attended some of the events during this business trip.

33.   During this trip, as in Prague, one evening Shigeta simply announced that the four of them were going out, and did not say where they were going. Once again, Biegel was in an uncomfortable position, because the head of the company was ordering him to go on an outing as a condition of his employment, but he did not know where he was going.

34.   This time, Shigeta took Biegel and his co-workers to a Japanese bath house. When they arrived, Shigeta took the men to a locker room and told them they were going to take a bath together. Biegel did not want to take a bath with Shigeta, and told him so, but Shigeta insisted, "yes, you will."

7

Biegel did not understand what he was supposed to do, but Shigeta then instructed him: "get naked!" Having given this command, Shigeta abruptly left the room. Somewhat disoriented and confused, Biegel, Mr. Rosen and Mr. Fidoten understood that they were supposed to take off their clothes and follow the path that Shigeta had taken. Once again, Biegel was humiliated and offended by this coercive conduct, but he was also afraid that he would suffer some kind of adverse action if he challenged Shigeta's authority. Biegel, Mr. Rosen and Mr. Fidoten thus attempted to follow Shigeta. In doing so, Shigeta effectively led them through a room, where they were required to parade naked in front of several other men. (None of the three Americans had a towel to cover themselves, although it turned out Shigeta did.) Eventually, the three men arrived naked at a bath where Shigeta was already situated. They were then expected to climb naked into the bath with Shigeta. To do this, each of the men also had to parade naked in front of Shigeta. It was obvious from his expression that Shigeta enjoyed subjecting Biegel and the others to this humiliating spectacle. Once again, Biegel was offended and humiliated by this outrageous, sexually degrading experience imposed on him as a condition of his employment.

35.     In May or June, 2006, Biegel learned that another Dentsu employee, Neal Gomberg (who is also Jewish), was possibly going to go on a business trip with Shigeta in Tokyo, Japan. Recalling what had happened to him on his business trips with Shigeta, Biegel became concerned that Shigeta

8

would subject Mr. Gomberg to a similarly sexually humiliating and degrading experience.

36. Therefore, Biegel approached Shigeta about the anticipated trip with Mr. Gomberg. Biegel urged Shigeta not to take Mr. Gomberg to the bath house, or on any similar "outing." Biegel explained to Shigeta how humiliated he was by that experience, and told Shigeta that he had almost complained to human resources about the incident, and in particular about Shigeta's conduct in forcing Biegel to parade about naked in front of him.

37. In response, Shigeta became very angry about the threat to report him to human resources for the sexually humiliating and degrading treatment he had accorded Biegel. Shigeta told Biegel that had he complained to human resources, Shigeta would have arranged to have him fired. Shigeta further threatened Biegel, telling him that if he ever did register such a complaint with human resources, Shigeta would see to it that he would be fired.

38. Subsequent to this conversation, Shigeta's attitude and demeanor toward Biegel changed completely and abruptly. Previously, Shigeta worked regularly and closely with Biegel, and dealt with Biegel on a regular basis. Further, Shigeta's demeanor toward Biegel had been generally positive.

39. However, following Biegel's complaint about Shigeta's sexually inappropriate conduct, Shigeta's attitude toward Biegel changed completely and for the worse. Shigeta cut off nearly all communication with Biegel. He

would no longer take or return phone calls, and despite repeated attempts by Biegel, Shigeta refused to meet with Biegel about business, or even to return his phone calls. Likewise, Shigeta cut off email communication and would no longer respond to Biegel's emails or communicate with Biegel by email. Last but not least, Shigeta pointedly refused to talk to Biegel. For example, when Shigeta was physically in the same office suite where Biegel worked, Biegel would attempt to engage Shigeta in conversation, even calling out to him. However, Shigeta would abruptly walk away, and simply refuse to speak with Biegel. From Shigeta's demeanor and behavior, from the threatening retaliatory comments he made to Biegel when Biegel complained, and from the timing of these events, it was obvious that Shigeta was extremely angry at Biegel for the complaint he had made about Shigeta's behavior.

40. Shortly after Biegel's complaint to Shigeta about the latter's sexually inappropriate conduct, Shigeta was promoted to become the CEO of Dentsu Holdings. In turn, Andree was appointed as the CEO of Dentsu America to replace Shigeta. From this point forward, Andree reported directly to Shigeta.

41. Upon information and belief, almost as soon as Andree was made CEO of Dentsu America, respondents made the decision to fire Biegel, in retaliation for the complaints he had made to Shigeta about the latter's sexually inappropriate conduct. Upon information and belief, both Shigeta and Andree were involved in the decision to fire Biegel.

42. Although they made the decision to fire Biegel almost as soon as Andree was made the CEO of Dentsu America, respondents did not inform Biegel of the decision, nor effectuate it, because they wanted to first find a replacement for Biegel as Creative Director. Upon information and belief, respondents ordered Ronald Rosen, Biegel's immediate supervisor, to begin looking for a replacement for Biegel. Upon information and belief, because Mr. Rosen did not believe Biegel deserved to be fired, he did not proceed expeditiously to find Biegel's replacement, although some candidates were interviewed. The fact that Mr. Rosen did not move quickly enough to find Biegel's replacement so he could be fired angered respondents.

43. On November 17, 2006, respondents abruptly fired both Biegel and Mr. Rosen.

44. Upon information and belief, they were replaced by Michael Wilson, who is not Jewish.

45. Upon information and belief, the terminations of Biegel and Rosen were part of a broader reduction in the number of Jewish employees in the creative department at Dentsu.

46. Prior to Andree becoming the CEO of Dentsu America, approximately one-half of the employees in the creative department were Jewish.

47. However, within a year of Andree becoming the CEO of Dentsu America, all of the Jewish employees in the creative department were gone.

48. In addition to Biegle and Rosen, for example, Neal Gomberg (another Jewish employee in the creative department) was also fired. Before his termination, Gomberg was another Sr. Vice President in the creative department.

49. None of these Jewish employees were replaced by other Jewish employees. The net outcome of Andree's tenure was the complete elimination of all Jewish employees in the creative department.

50. The foregoing conduct and statements are only examples of the sexual harassment to which Biegel has been subjected, and they do not constitute every instance of sexual harassment that Biegel has suffered.

51. The conduct of respondents encompass the foregoing acts as well as other unlawful acts of harassment.

52. By complaining about the sexually inappropriate conduct of Shigeta, and threatening to bring the complaint to human resources, Biegel was engaged in protected activity, known to respondents.

53. Respondents retaliated against Biegel, by firing him for his complaints and protected activity.

54. In or about December, 2006, a draft copy of a related Complaint for federal court was sent to the respondents in this proceeding, with a cover letter advising them that Biegel intended to file the Complaint in court.

55. Subsequently, that action was filed with the United States District Court for the Southern District of New York, on or about October 31, 2007.

56. In addition, Biegel also filed the original charge of discrimination in this proceeding against respondents with the Equal Employment Opportunity Commission.

57. In asserting these claims against respondents, Biegel was engaged in protected activity, known to respondents, under both the federal, state and local civil rights laws.

58. In response to Biegel engaging in this protected activity, respondents have further retaliated against Biegel, by defaming him, and by attempting to injure his personal, professional and business reputation.

59. Among other things, respondents have publicly accused Biegel of fraud, and have also publicly attacked Biegel's professional competence.

60. These statements were false and defamatory, and were widely published to the public by respondents.

61. Upon information and belief, respondents have made other false, defamatory statements regarding Biegel.

62. These defamatory statements have caused injury to Biegel, including injury to his personal, professional and business reputation.

63. By the foregoing conduct, respondents have retaliated against Biegel.

64. Biegel's firing was also discriminatory, in that Biegel was fired in part because he is Jewish.

65. By the foregoing conduct, respondents have created and maintained a sexually hostile work environment on the basis of Biegel's gender.

66. By the foregoing conduct, respondents have unlawfully retaliated against Biegel.

67. By the foregoing conduct, respondents have discriminated against Biegel because he is Jewish.

Respectfully submitted,

THE DWYER LAW FIRM, L.L.C.
Attorneys for Charging Party
Steve Biegel

By: _____
Andrew Dwyer

Dated: 11/16/07

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of November, 2007, I arranged that a true and correct copy of the within Amended Charge of Discrimination be served via regular first class mail, postage prepaid, on counsel for respondents at their last known address:

>Howard J. Rubin
>Davis & Gilbert, LLP
>1740 Broadway
>New York, New York 10019
>Attorneys for Respondents

*Andrew Dwyer*

Dated: November 16, 2007