UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE DWYER LAW FIRM, L.L.C.
17 Academy Street, Suite 1010
Newark, New Jersey 07102
(973) 242-3636
Andrew Dwyer (AD-7793)
Attorneys for Plaintiff

---

STEVE BIEGEL,

    Plaintiff,

v.

DENTSU HOLDINGS USA, INC.,
DENTSU AMERICA, INC.,
TOYO SHIGETA and
TIMOTHY ANDREE,

    Defendants.

---

Hon. Colleen McMahon, U.S.D.J.

Civil Action No. 07-9653 (CM) (THK)

**DECLARATION OF
STEVE BIEGEL**

Steve Biegel, under penalty of perjury and pursuant to 28 U.S.C. § 1746, hereby declares as follows:

    1.    I am the plaintiff and I am familiar with the matters set forth herein. I submit this Declaration in opposition to defendants' motion to dismiss.

    2.    Defendants claim that I have not accurately described what occurred when I was forced/duped by my boss, defendant Toyo Shigeta, to go to a bathhouse in Japan, take off all my clothes, and parade naked in front of my boss and others. Contrary to the statements of defendants' attorneys,

1

the description of this event in ¶¶ 36-38 of my Amended Complaint is entirely accurate.

3.  In their motion, defendants claim I did not complain about this and other sexually harassing incidents to anyone at Dentsu. This is false. I complained to Toyo Shigeta directly, and even threatened to report him to Human Resources for the bathhouse incident. In response, he threatened to retaliate against me by firing me. This is all detailed in the Amended Complaint, ¶¶ 39-43.

4.  In addition, I also complained about these incidents to my immediate supervisor, Ron Rosen. This is confirmed by a sworn Declaration from Mr. Rosen, which is annexed as Exhibit B to the Declaration of Andrew Dwyer, filed herewith (hereinafter "Dwyer Decl.").

5.  It is my understanding that my attorney informed defendants' present counsel of these complaints – including the complaints to Mr. Rosen – several months ago, before this suit was filed, and defendants' attorneys never challenged that I complained to Mr. Rosen (nor could they given his sworn statement). A copy of this letter from my attorney to defense counsel, dated February 28, 2007, is annexed hereto as Exhibit A. Thus, defendants' attorneys are being quite disingenuous with this Court in suggesting that they believe that I never complained about these incidents.

6.  Complaining to Mr. Rosen and Mr. Shigeta was completely consistent with Dentsu's alleged policy, which supposedly states that an

2

employee "must bring the problem to the attention of their supervisor." See Declaration of Douglas Fidoten, Exhibit B annexed thereto (dated Nov. 26, 2007) (hereinafter "Fidoten Decl."). I did precisely that.

7. Other than being threatened with retaliatory termination by Mr. Shigeta for my complaint directly to him, there was never any response to my complaints. Being threatened with retaliation by Mr. Shigeta, frankly, deterred me from making further complaints.

8. Defendants claim in their motion to dismiss that I do not allege that I was offended by the bathhouse incident, nor by the other incidents of sexual harassment detailed in the Amended Complaint. This is false. I make this allegation repeatedly in the Amended Complaint. See Amended Complaint, ¶¶ 24, 27, 33, 38, 39, 40, 52, 53, 56, 57 and 64.

9. Likewise, defendants claim that I do not allege in the Amended Complaint that the sexual harassment altered the conditions of my employment. This is also false. See Amended Complaint, ¶ 62.

10. As I allege in the Amended Complaint, after I complained about the bathhouse incident, and threatened to report Mr. Shigeta to Human Resources, he immediately threatened to fire me in retaliation, were I ever to lodge such a complaint. Amended Complaint, ¶¶ 40-41.

11. Further, as I allege in the Amended Complaint, after I made this complaint to Mr. Shigeta, his demeanor toward me changed abruptly,

permanently and for the worse, with him essentially cutting off all contact with me. Amended Complaint, ¶¶ 42-43.

12. Thus, contrary to defendants' argument in their motion to dismiss, I made specific allegations that connect the sexual harassment to my termination, and that demonstrate that the termination was retaliatory. I also specifically alleged in the Amended Complaint that defendants retaliated against me for my complaints, and that by retaliating against me, defendants thus condoned the sexual harassment. Amended Complaint, ¶¶ 69-70. Contrary to defendants' false statement in their motion, I specifically alleged in the Amended Complaint that the decision to terminate me was made "in retaliation for the complaints [plaintiff] had made to defendant Shigeta about the latter's sexually inappropriate conduct." Amended Complaint, ¶ 45.

13. As I alleged in the Amended Complaint, I made my complaint to Mr. Shigeta in May or June, 2006. Amended Complaint, ¶¶ 39-41. Mr. Shigeta immediately threatened me with termination in retaliation. Amended Complaint, ¶ 41. Shortly thereafter, Timothy Andree was appointed as the CEO of Dentsu America (with Andree reporting directly to Shigeta). Amended Complaint, ¶ 44. As alleged in the Amended Complaint, almost as soon as Mr. Andree became CEO, Andree and Shigeta made the decision to fire me in retaliation for my complaints. Amended Complaint, ¶ 45. However, as alleged in the Amended Complaint, although the decision to fire me was made almost immediately upon Mr. Andree's appointment, it was not carried

out until November 17, 2006, because of an ongoing effort to find a replacement for me. Amended Complaint, ¶ 46.

14. In their motion, defendants claim that I cannot show causation. Defendants ignore Mr. Shigeta's specific threat of retaliation, and they do not deny his involvement in my termination. (Although defendants' attorneys repeatedly make statements to the effect that Mr. Shigeta allegedly denies the allegations against him, significantly, Mr. Shigeta has never made any public statement in any venue about the allegations in this case.) Nonetheless, defendants claim that I do not sufficiently allege causation. Defendants' attorneys tell this Court that my allegation that the decision to fire me was made in or about June, 2006, is "without any factual support" and is "wholly conclusory and therefore must be dismissed." Defendants' Brief, at 22.

15. Once again, defendants' attorneys are being quite disingenuous with this Court. In fact, in his sworn statement, Ronald Rosen specifically states that he was told in the summer of 2006 that the decision to fire me had already been made, but that it could not be carried out until a replacement was found. Dwyer Decl., Exhibit B annexed thereto. Again, defendants' attorneys were specifically told of this evidence several months ago, in a letter from my attorney. See Exhibit A annexed hereto.

16. Not only did defendants' attorneys not dispute the timing of the decision to fire me, they admitted it. As defendants themselves concede, the appointment of Mr. Andree to CEO occurred in early June, 2006 (which would

5

have been right after I complained to Mr. Shigeta and threatened to go to Human Resources). See Fidoten Decl., ¶ 1. In a letter to my attorney, dated January 4, 2007, defendants' present attorney stated that the decision to fire me was supposedly made almost immediately after Mr. Andree was appointed CEO. See Exhibit B annexed hereto (stating that Andree made the decision to fire plaintiff following a meeting with plaintiff, which occurred "when Andree became President [sic] of Dentsu"). (The defendants' attorneys' other statements about *how* – as opposed to *when* -- the decision was made to fire me, are directly contradicted by the sworn statement of Ronald Rosen. See Dwyer Decl., Exhibit B annexed thereto.)

17. Thus, once again, defendants' attorneys are being disingenuous with this Court regarding the timing of my termination. They know that the decision to fire me was made in or around June, 2006, even though it was not carried out until months later, due to the effort to locate a replacement for me.

18. When I was fired, on November 17, 2006, I was fired simultaneously with Ronald Rosen. Both Mr. Rosen and I are Jewish. We were replaced by Michael Wilson, who is a Gentile. (I know Mr. Wilson from when we both worked together for a prior employer.) It is my understanding that Mr. Wilson is being paid $450,000 per year, plus various benefits, which is almost exactly equal to the combined salary Mr. Rosen and I were paid at Dentsu.

19. Mr. Rosen and I – both Jews -- were fired by Mr. Andree, who is a Gentile. Also, as I alleged in the Amended Complaint, Mr. Shigeta (who is also not Jewish) participated in the decision to fire me. Significantly, in their motion defendants do *not* dispute that Mr. Shigeta participated in the decision to fire me. See Defendants' Brief, at 22. If permitted to take discovery, I believe I will be able to show that the search costs for my replacement, Mike Wilson, were paid for by Dentsu Holdings, USA, Inc., with the approval of Mr. Shigeta. Therefore, Mr. Shigeta was aware of and approved my termination, months before it happened.

20. Thus, myself and Ron Rosen – two high level Jewish employees – were both fired simultaneously by Gentiles Andree and Shigeta, and replaced with a Gentile, Mike Wilson.

21. Moreover, subsequent to our firing, every other Jewish employee in the Dentsu creative department has either been fired or otherwise left. A creative department that was formerly about 50% Jewish now has no Jews. For example, Neal Gomberg is another Jew who worked in the creative department at Dentsu. As I alleged in the Amended Complaint, he is the employee who Shigeta was going to take to Japan, the specific subject we were discussing when I registered my complaint with Shigeta in 2006. See Amended Complaint, ¶¶ 39-40.

22. Incredibly, defendants' attorneys cite Mr. Gomberg's employment at Dentsu as evidence that they did not fire employees because

7

they were Jews. Defendants' Brief, at 6. Defendants' attorneys fail tell this Court, however, that **Mr. Gomberg has now also been fired by Mr. Andree**.

23. Perhaps the most disingenuous argument, however, is defendants' reliance on Douglas Fidoten as proof that they do not discriminate against Jews. Mr. Fidoten is Jewish and, ostensibly, the President of Dentsu America. Supposedly Mr. Fidoten directly reports to defendant Andree, and so is second-in-command. Defendants emphasize this point, arguing that "DAI employs Jewish individuals in high positions of power, including its current President." Defendants' Brief, at 3. Defendants have not filed any statement from defendants Andree or Shigeta, but they made a point to file a Declaration from Mr Fidoten.

24. I submit, however, that discovery will show that **defendants have openly discussed firing Mr. Fidoten.** Indeed, he has probably kept his job thus far only because of the pendency of my claims. Further, even as he remains technically employed as Dentsu's President, in reality, he has been stripped of his powers, so that his own subordinate and his own boss have expressly decided to operate behind his back, making the real decisions for how the agency should be operated – even for how Fidoten himself should be handled. Specifically, I believe discovery will show that Mike Wilson (Mr. Fidoten's supposed subordinate) and Tim Andree have openly discussed the idea of firing Mr. Fidoten, as well as reassigning his responsibilities. Indeed, it is my understanding that Mr. Fidoten himself has become aware of his

8

precarious position, and has been talking to others in the industry about the possibility that he may lose his job.

25. Significantly, before Mr. Andree and Mr. Wilson came on board, Mr. Fidoten had an active and important role in the company's business. For example, one of the most important parts of our business are new business meetings. These are the meetings where we would meet with prospective new clients, in an attempt to persuade them to hire us to handle their advertising account.

26. Before Mr. Andree and Mr. Wilson came on board, Mr. Fidoten *always* attended these meetings. In fact, he not only attended these meetings, he actively led them.

27. However, after Mr. Wilson was hired by Mr. Andree, Mr. Fidoten was excluded from new business meetings. Instead, Mr. Andree and Mr. Wilson now attend and lead these meetings, because they are the ones leading the agency, not Mr. Fidoten.

28. Significantly, on September 17, 2007, the trade publication AdWeek published a very lengthy, 5,000 word feature article about Dentsu, and in particular, about Dentsu America. A copy of this article is annexed hereto as Exhibit C. The article was largely flattering, and was somewhat unusual in providing such a prominent platform to give praise to a particular agency. But what is most significant about the article is that in 5,000 words,

9

Mr. Fidoten – supposedly the President of the company! – is not mentioned even once.

29. By contrast, Mr. Andree and Mr. Wilson are both prominently featured in the article – as the first Westerners at Dentsu ever to make an annual company climb up Mount Fuji in Japan; and more importantly, as the leaders who will supposedly be bringing Dentsu America in a new direction. Indeed, the article even includes a biographical sketch of Mr. Andree and Mr. Wilson ("The hoops star and the Army brat"), the only two people in the article to receive such treatment. But as noted, Mr. Fidoten is not mentioned at all, even though he is supposedly Mr. Wilson's boss, and putatively the head of the company. (The article makes clear, incidentally, that Andree – not Fidoten – not only made the decision to hire Wilson, but also the decision to hire several other new employees.)

30. Thus, far from defeating any charge that defendants discriminate against Jews, Mr. Fidoten is further support for my claim. Mr. Fidoten appears to hold a "high position of power" in name only, with his own Gentile subordinate and Gentile boss working behind his back to make the actual decisions at the agency. Indeed, discovery will show that defendants have openly discussed firing Mr. Fidoten, as well as removing his responsibilities. Mr. Fidoten is quite literally a token Jew, presented as a fig leaf to hide the simple fact that Mr. Andree and his fellow Gentile managers have in one year eliminated every Jew in the creative department at Dentsu.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Steve Biegel

Executed on November 30, 2007