# EXHIBIT A

# THE DWYER LAW FIRM, L.L.C.

17 ACADEMY STREET, SUITE 1010
NEWARK, NEW JERSEY 07102

ANDREW DWYER*

*ADMITTED IN NJ & NY

(973) 242-3636
FAX (973) 242-3399



February 28, 2007

**VIA REGULAR MAIL AND FAX (212-621-0919)**

Howard J. Rubin
Davis & Gilbert, LLP
1740 Broadway
New York, New York 10019

    Re:   <u>Steve Biegel and Dentsu</u>

Dear Mr. Rubin:

    I am following up with you regarding the claims of my client, Steve Biegel, against your clients, Dentsu Holdings, USA, Inc., Dentsu America, Inc., Toyo Shigeta and Timothy Andree. I previously outlined these claims in the draft complaint I sent your clients. I am also responding to some of the statements made in your letter dated January 4, 2007.

    The emotional tone of your letter is not conducive to any constructive discussion. For example, I take exception to your repeated charge of "blackmail." Sending someone a draft complaint, and offering to negotiate the claim, is nothing other than the professional courtesy I would extend to any defendant before filing suit. Responding with a charge of "blackmail" does not help move the discussion forward.

    Likewise, I do not see much point in responding to your primer on employment law. I have been exclusively litigating employment claims for over a decade. There is no question that Mr. Biegel's claims, were we to file suit, would have to be litigated in the ordinary fashion -- with extensive discovery and ultimately, a trial. As you surely know, your clients have no hope of prevailing on a pre-discovery motion to dismiss, which means there will be extensive litigation before the claims are resolved -- unless the parties reach a voluntary settlement.

    I do want to address, however, some of the factual claims made in your letter, because they are almost uniformly mistaken. Your clients should

Howard J. Rubin
February 28, 2007
Page 2 of 8

understand that the factual picture you are trying to present will not be sustained by the evidence.

First, the evidence will show that Mr. Shigeta engaged in the conduct described in the complaint. Indeed, you do not even dispute most of his conduct.

*You do not deny the incident in Brazil where Mr. Shigeta nearly came to blows for taking "crotch shots" of scantily clad women on the beach. You now claim this was a form of "artistic expression."

*You do not deny that Mr. Shigeta took Mr. Biegel and Scott Weitz -- apparently on the company dime -- to a brothel in Prague, where Mr. Shigeta ordered and paid for prostitutes for his two subordinates. (Nor do you deny that Mr. Shigeta himself hired a prostitute on this occasion.) Apparently, you contend that if the president of a corporation tries to get subordinates to have sex with prostitutes, there is nothing harassing about that conduct. I think most objective observers will think otherwise, and will find Mr. Shigeta's conduct completely out of line.

*You do not deny that Mr. Shigeta told others that he had sealed a deal with another Japanese businessman by having "double penetration" sex with a prostitute in Mexico, nor that Mr. Shigeta claimed this was a "Japanese style" of conducting business. You now claim, however, that this was only a fictional story, fabricated by Mr. Shigeta. Even if one were to now credit Mr. Shigeta's odd claim that we should trust that he was lying when he told this story to several people, any objective observer will agree that this is a wholly inappropriate discussion for a president of an advertising company to be having with his subordinates. But, of course, any objective observer (such as Dentsu's clients or prospective clients) will be even more horrified to learn this is Dentsu's "Japanese style" of conducting business, should they not believe Mr. Shigeta's denial. For example, Jo Williams at Toyota would probably not feel Mr. Shigeta's comments about a "Japanese style" of making a deal are harmless.

*You do not deny that Mr. Shigeta took a crotch shot of Maria Sharapova -- without her knowledge or consent -- during a photo shoot for Dentsu's client, Canon. Rather, you state Mr. Shigeta "does not have a specific recollection of photographing Sharapova." No one -- especially not Canon nor Ms. Sharapova -- will find that "non-denial

denial" particularly persuasive. And, in any event, there are multiple witnesses to the event. Apart from Mr. Biegel and the forgetful Mr. Shigeta, Ms. Sabban will confirm that Mr. Shigeta took the shot, and we believe Ron Rosen witnessed it as well. It is possible that other members of Ms. Sharapova's staff also learned about the crotch shot, and we can certainly check with her agent, Max Eisenbud, to find out, if you like. (Apparently, Ms. Sharapova and her personnel will be in South Florida for a shoot in early April.) You also seem to claim, incredibly, that even if Mr. Shigeta did take a crotch shot of Ms. Sharapova without her knowledge or consent, this too was a form of "artistic expression," and that no one would find the surreptitious photo offensive. I doubt anyone -- least of all Ms. Sharapova -- will see it that way.

*Last but not least, you do not deny that Mr. Shigeta took Mr. Biegel and others on a business trip to an undisclosed location, which turned out to be a bathhouse, where Mr. Biegel other subordinates were required to parade through the facility naked. Again, any neutral observer will readily disagree with your belief that there is nothing harassing about being required by your boss to parade in the nude.

While making these admissions, however, you attempt to deflect this evidence by making various mitigating claims. With regard to the harassment claim, you allege the following:

*You claim Mr. Biegel wanted to go to the brothel in Prague. This will not be borne out by the only other witness to the event, Scott Weitz. We believe Mr. Weitz will not support the idea that Mr. Biegel wanted to have sex at the brothel. (Also, independently of Mr. Biegel and Mr. Weitz, there is apparently other evidence that Mr. Shigeta visited prostitutes on other business trips -- thus undermining any suggestion that this was not Mr. Shigeta's idea.) Likewise, your claim that Mr. Biegel and Mr. Weitz saw other prostitutes at another establishment on the same trip will not be supported by the evidence. Rather, after going to the Escade brothel with Mr. Shigeta, all three men left in a car with a driver. However, Mr. Shigeta was so drunk that he passed out in the car. Mr. Biegel and Mr. Weitz wanted to stop somewhere to talk about what had happened, and went into another bar. (Mr. Shigeta was too drunk to go anywhere, and remained passed out in the car.) Mr. Weitz will testify that he and Mr. Biegel did nothing at this establishment other than have a drink and talk -- they did not see any prostitutes, and Mr. Biegel was with Mr. Weitz the entire time. If Mr. Shigeta has suggested

to you that Mr. Biegel by himself visited a brothel that night (as your letter implies), then his claim will be directly contradicted by Mr. Weitz.

*You claim that Mr. Biegel not only did not object to the trip to the Japanese bathhouse, but in fact enjoyed it.* On the contrary, we believe if subpoenaed Ron Rosen would testify that Mr. Biegel was upset and humiliated by the visit at the time, and that Mr. Biegel complained to Mr. Rosen about this incident. You also try to suggest that Mr. Biegel and the others were not required to walk naked in front of Mr. Shigeta. Any such claim, we believe, will be flatly contradicted by the testimony of others present, including Mr. Rosen.

*You claim that Mr. Biegel never complained about Mr. Shigeta's behavior.* This will be contradicted not only by Mr. Biegel's testimony (who will testify that he complained directly to Mr. Shigeta himself) but also by others. Again, we believe Mr. Rosen, if subpoenaed, would testify that Mr. Biegel complained directly to him about Mr. Shigeta's conduct, involving both the bathhouse and the brothel. Given that Mr. Rosen was Mr. Biegel's immediate supervisor at the time, it was entirely appropriate for him to complain to Mr. Rosen.

*Most elaborately, you make a variety of accusations that Mr. Biegel welcomed Mr. Shigeta's sexually harassing behavior.* But you have scant evidence to support any such claim. As noted, we believe that, if subpoenaed, Mr. Rosen would testify that Mr. Biegel complained to him about Mr. Shigeta's behavior, so it was clearly not welcome. Likewise, we believe your claim that Mr. Biegel and Mr. Rosen together watched what you describe as "the Paris Hilton XXX video" will be contradicted by Mr. Rosen (as well as Mr. Biegel, of course). Likewise, the exhibits to your letter prove nothing. Exhibits 1 and 2 are simply photographs (none of which involve Mr. Biegel) that were emailed to Mr. Biegel by other people. Indeed, as your own correspondence discloses, the photos in exhibit 2 were sent to Mr. Biegel by Eric Rand. Obviously, Mr. Biegel cannot control what other people send him. The only item you have that is **from Mr. Biegel** (as opposed to being from someone else) is an email chain about a Canon national sales meeting. In that email chain, Mr. Biegel states that as part of his registration he ordered a Swedish massage. As you should know if you have any familiarity with the corporate world, it is common at conferences for registrants to have a menu of activities to select from (massage, golf, etc.). There is nothing illicit or sexual about a therapeutic massage. Indeed, I think it is fair to say that the event's organizers (that is, Canon) would be

shocked by your suggestion that they were trying to arrange a sexual tryst with this offering. Finally, you have two photos of Mr. Biegel with two women. If -- as your letter suggests -- you believe you can use the photos to intimidate Mr. Biegel, you are sadly mistaken. Contrary to your letter, I think most people will understand there is a world of difference between being photographed with your arm around a woman, and being required to have sex or take off your clothes on a business outing with your boss. But the most striking aspect of your letter and its attachments, of course, is that despite a thorough electronic search of Mr. Biegel's computer, all you could find was an email where he registered for a non-sexual massage. We do not have access to Dentsu's computers -- yet. If we file suit we will gain access via discovery, and given Mr. Shigeta's conduct, we are likely to find many other instances corroborating Mr. Biegel's accusations.

*You claim that Mr. Biegel did not properly use Dentsu's sexual harassment policy.* But the policy itself states that the employee should complain to his or her immediate supervisor, and as noted, Mr. Biegel complained directly to Mr. Rosen about Mr. Shigeta's behavior. Likewise, as noted, Mr. Biegel complained to Mr. Shigeta himself. On this last point, obviously, we have a classic disputed issue of fact that can only be resolved by a jury -- in this case, a jury that will be confronted with considerable evidence that Mr. Shigeta's credibility is worthless.

Turning from Mr. Shigeta's pattern of sexual harassment to Mr. Biegel's termination, you make the following assertions:

*You claim that the person who made the decision and/or recommendation to fire Mr. Biegel was Ron Rosen.* You claim that Andree made the decision to fire Mr. Biegel on the recommendation of Ron Rosen. We believe that if subpoenaed, Mr. Rosen will flatly contradict that claim. In fact, we believe Mr. Rosen will testify that he had nothing to do with Mr. Biegel's termination, and that he never advocated that Mr. Biegel be fired. Instead, we believe Mr. Rosen will testify that he was simply informed of that the decision to fire Mr. Biegel had already been made, and then was told to look for a replacement.

*You claim that Mr. Biegel cannot make out a prima facie case of religious discrimination.* He can establish a prima facie case if he was in a protected class; was performing his job adequately; was fired; and

Howard J. Rubin
February 28, 2007
Page 6 of 8

was replaced by someone outside the protected class. He meets each of these criterion. Indeed, you do not challenge that in your letter.

*You claim that Mr. Shigeta had nothing to do with Mr. Biegel's termination.* Interestingly, this claim is contradicted by your own letter. You claim that the triggering event for Mr. Biegel's termination was a conversation Mr. Biegel had with Mr. Andree about Mr. Biegel's future role in the organization upon Mr. Andree becoming CEO. However, Mr. Biegel had this conversation because Mr. Shigeta told him to. It was Mr. Shigeta, in fact, who specifically told Mr. Biegel to tell Mr. Andree to make Mr. Biegel co-creative director with Mr. Rosen. Thus, if these comments were the triggering event that resulted in Mr. Biegel's termination (as your letter claims), then Mr. Shigeta set up Mr. Biegel for termination.

*You claim that Mr. Biegel never engaged in protected activity.* This is clearly wrong. Mr. Biegel's complaints to both Ron Rosen and Mr. Shigeta (respectively, his immediate supervisor and his supervisor's supervisor) clearly constitute protected activity. As noted, we believe that if subpoenaed, Mr. Rosen would confirm that Mr. Biegel complained to him. And even if Mr. Shigeta denies Mr. Biegel's complaints to him, that is a classic disputed issue of fact that can only be resolved by a jury.

*You claim that there is no causal connection between Mr. Biegel's complaints and his termination.* Causal connection can be established by tight temporal proximity. Here, the decision to fire Mr. Biegel was made almost immediately after his complaint to Mr. Shigeta. The fact that the decision was not carried out until some months later is immaterial, given that the company was looking for a replacement. The causal connection is further demonstrated by Mr. Shigeta's express retaliatory threat made to Mr. Biegel, and by Mr. Shigeta's subsequent decision to refuse to communicate with Mr. Biegel.

*You claim that Mr. Biegel had serious deficiencies in his work performance.* Yet, there is only one deficiency you actually cite in your letter. You claim that a shoot for a Canon commercial went badly, and this was Mr. Biegel's fault. This is false. We believe independent witnesses (including Ron Rosen) will testify that the advertisement for which Mr. Biegel was responsible actually turned out to be very successful. However, the initial presentation of the shoot was poorly presented to Canon. This was not Mr. Biegel's fault, but rather was

due to an error committed by Douglas Fidoten. Mr. Fidoten insisted on showing the initial shoot to the Canon representatives on Quicktime. This is a very rough medium, which produces a grainy, de-saturated film. Mr. Biegel tried to convince Mr. Fidoten not to do this, and tried to explain to him that the shoot was not ready to be shown to the client. Mr. Fidoten insisted on showing it to the client anyway (over Mr. Biegel's objections), even though it was not ready. As feared, the client was unhappy with the result, and a decision was made to re-shoot the advertisement. Everyone at the time recognized and understood this was not Mr. Biegel's fault. In fact, Mr. Shigeta himself specifically wanted Mr. Biegel to work on the re-shooting, because he trusted that Mr. Biegel would fix the problem caused by Mr. Fidoten's poor judgment.

Indeed, with regard to the termination claim, the most salient point of your letter is that you really cannot come up with any legitimate reason for Mr. Biegel's termination. Indeed, you cannot even come up with any actual instance where he failed to perform his work adequately. The truth is that Mr. Biegel was widely regarded at Dentsu as an outstanding creative director. Mr. Biegel's high performance will be confirmed by Dentsu's clients, such as Tiger Ishii at Canon.

In sum, both Mr. Biegel's harassment claims and his termination claims will have to be fully litigated before they are finally resolved, unless the parties reach a voluntary settlement of the claims. In the absence of settlement, this will require discovery regarding Mr. Biegel's employment, as well as discriminatory treatment of other Dentsu employees, and other similar instances of misconduct involving Mr. Shigeta. The discovery will necessarily extend to third parties as well, of course. For example, because you dispute the origin of Mr. Shigeta's crotch shot of Maria Sharapova, and claim that it was a non-offensive instance of "artistic expression," we will need to depose Ms. Sharapova, her manager Max Eisenbud, and other people present at the shoot. Likewise, because you deny that Mr. Shigeta organized the outing to the brothel, we will need discovery regarding the financial records for the trip, including credit card bills and expense reports. Because you accuse Mr. Biegel of poor work performance in connection with the Canon shoot, we will need to depose Dentsu's clients (or, perhaps, former clients), to determine how they viewed Mr. Biegel's work. And given that you dispute the circumstances of the Japan trip cited in the complaint, we will need to depose the other people who were involved in that trip, including "Ted" Machida.

Howard J. Rubin
February 28, 2007
Page 8 of 8

    Those are just examples. Given the nature of the allegations, and your denials, the scope of discovery will be very broad indeed.

    The cost and inconvenience of such litigation, standing alone, I hope will be enough for your clients to explore other options. I will call you upon sending this letter to discuss some of those options with you.

                              Very truly yours,

                              THE DWYER LAW FIRM, L.L.C.

                              Andrew Dwyer

cc:    Steve Biegel