UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE DWYER LAW FIRM, L.L.C.
17 Academy Street, Suite 1010
Newark, New Jersey 07102
(973) 242-3636
Andrew Dwyer (AD-7793)
Attorneys for Plaintiff

| | |
|---|---|
| STEVE BIEGEL, | Hon. Colleen McMahon, U.S.D.J. |
| Plaintiff, | Civil Action No. 07-9653 (CM) (THK) |
| v. | |
| DENTSU HOLDINGS USA, INC., DENTSU AMERICA, INC., TOYO SHIGETA and TIMOTHY ANDREE, | **SUPPLEMENTAL DECLARATION OF STEVE BIEGEL** |
| Defendants. | |

Steve Biegel, under penalty of perjury and pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1. I am the plaintiff and I am familiar with the matters set forth herein. I submit this Supplemental Declaration in opposition to defendants' motion to dismiss.

2. In particular, I submit this Declaration in accordance with this Court's ruling dated January 7, 2008, which converted a portion of defendants' motion to dismiss to a motion for summary judgment, namely, that aspect of defendants' motion that addresses the "Faragher-Ellerth"

1

defense to my claims of harassment. Per the Court's instructions, I am submitting this Supplemental Declaration, in particular, to present evidence about when and to whom I complained about various incidents alleged in the Amended Complaint. Per the Court's instructions, I am **only** addressing the nature of the complaints. I am not addressing any other issue, and in particular, I am not addressing the incidents of harassment themselves, except insofar as they relate to the complaints I made.

3. I do not recall ever being told by anyone at Dentsu anything about a sexual harassment policy. I do not recall the issue being addressed in any kind of meeting or training.

4. In their original motion to dismiss, defendants provided the Declaration of Douglas Fidoten (dated Nov. 26, 2007). Mr. Fidoten's Declaration has attached to it as Exhibit C an "Acknowledgement Form," which was signed by me. However, the acknowledgement form does not say anything about a sexual harassment policy. Rather, it states that I have been given a copy of Dentsu's "Policies and Procedures Employee Manual."

5. Frankly, I do not remember one way or the other whether, in fact, I received a copy of a "Policies and Procedures Employee Manual" at Dentsu. If I did receive it, however, I was not aware one way or the other whether it contained a sexual harassment policy, because I do not recall anyone ever mentioning to me that such a policy was found in a manual, or anywhere else.

2

6. During the time I worked for defendants, my immediate supervisor was at all times Ron Rosen. During most of the time I worked at Dentsu (and during the incidents in question), Mr. Rosen's supervisor was Toyo Shigeta. Therefore, Mr. Shigeta was my next level supervisor. During most of the time I worked at Dentsu, there was no one else in my chain of command. This did not change until the summer of 2006, when Timothy Andree was hired, and he became Mr. Rosen's supervisor (and thus in my chain of command).

7. Douglas Fidoten also worked for defendants during the time I was working for defendants. However, Mr. Fidoten was not actually in my chain of command during most of the incidents of harassment described in the Amended Complaint. However, when Timothy Andree became CEO of Dentsu America in the summer, 2006, Mr. Fidoten became President and then was in my chain of command.

8. Because all of the incidents involved Mr. Shigeta, I did not consider him a viable candidate with whom to register a complaint – that is, it did not make a great deal of sense to me to complain directly to Mr. Shigeta about his own conduct. This was particularly so because the atmosphere at Dentsu was one where I frequently felt employees were at risk of being fired at whim by Mr. Shigeta. Mr. Shigeta would periodically fly into rages and scream at employees, threatening to fire them. For example, I recall one instance where Randy Novick (who is Jewish) made a small complaint or

comment to Mr. Shigeta. Mr. Shigeta became livid, and threatened to fire Mr. Novick (telling him "I'm going to fire you"). In fact, Mr. Novick later was fired.

9. Although Mr. Shigeta regularly expressed happiness with my work, he also treated every project as a crisis, and frequently expressed the view that if a project did not go well, people on the creative team could be fired. One of his favorite expressions (in describing what would happen if something did not go well), was to say, "It could be your head."

10. Mr. Shigeta was also very unpredictable and volatile generally. When I raised any complaint about him to Mr. Fidoten, Mr. Fidoten would commonly shrug and say he could do nothing to control Mr. Shigeta. Given that Mr. Shigeta was the very highest official in the company, this contributed to an atmosphere of fear, which in turn discouraged any kind of dissent.

11. Finally, the culture of the company was such that employees were always expected to be slavishly deferential to their "superiors." Even inadvertent physical gestures, or the failure to show sufficient gratitude, could be interpreted as signs of disrespect, warranting punishment. This also contributed to an atmosphere where I was quite reluctant to raise any kind of complaint – especially any complaint directed against Mr. Shigeta.

12. In or around June, 2004, I was required to travel to Prague, along with Mr. Shigeta, to complete a shoot for a commercial for Canon. It was strongly impressed on me by Mr. Shigeta that this was a terribly important project, and that failure to carry out this project well would mean

people would lose their jobs. Given the nature of the project, and the atmosphere surrounding this work, I had a strong sense that I should not do anything to make waves.

13. It was on this trip that Mr. Shigeta took myself and Scott Weitz (a producer, who was not a Dentsu employee) to a brothel in Prague. Without recounting the details of this event (which is referenced in greater detail in the Amended Complaint), the main point I wish to convey is that this event was organized by Mr. Shigeta as a required company outing. He arranged where we were going (without telling us), arranged for the car, took us to the brothel, and paid for the event. Thus, this was very much an event where Mr. Shigeta used his authority as my supervisor's supervisor (and as the head of the company) to force me to participate in this harassing event.

14. There was no other Dentsu employee on this trip, and thus no one else I could complain to, other than Mr. Shigeta himself. However, immediately when I returned from the trip (therefore, sometime in June, 2004), I approached my immediate supervisor, Ron Rosen, and told him what had happened. I complained to Mr. Rosen about being forced and tricked to go to the brothel, and explained why the visit had made me uncomfortable and left me feeling humiliated. Other than Mr. Rosen, there was no one else in my chain of command to complain to about this incident.

15. Another incident occurred in October, 2004, when Mr. Shigeta, myself and other Dentsu employees traveled to Japan. Mr. Rosen and Mr.

Fidoten were both on this trip. The idea of this trip was to introduce us to high level officials at Dentsu, Inc., in Japan, the parent company of our employer. It was on this trip that I was forced to go to a bathhouse and take off all my clothes in front of my boss, Mr. Shigeta, and then take a bath with him.

16. As with the trip to the brothel in Prague, Mr. Shigeta did not tell us where we were going or what we were doing, but simply told us we were going on an outing. This was something organized and arranged for by Mr. Shigeta, and paid for by him as well (or paid for by the company). Thus, this is another instance where Mr. Shigeta used his power as the company's highest official to force us to participate in this outing.

17. When we arrived at the bathhouse, it was only while we were standing in line that we began to have some idea of where we were. Defendants, in their prior submissions, mention that patrons at the bathhouse were given robes. This is true, but misleading. We were given robes, but were instructed the robes were for "later." We were then ushered into an undressing room, and told to take off all our clothes, and go into the bath area naked. Thus, there was nothing to cover us when we were in the bath area. The robes were only available to be worn after the bath was completely over, and we were walking about the mall-like area connected to the baths.

18. It was when we arrived in the undressing room for the bath that Mr. Shigeta commanded me and the others to "get naked." I tried to figure out from Mr. Shigeta what was going on, and he told us that we were going to

6

take a bath together. At this point, I specifically confronted Mr. Shigeta and complained about this, saying to him words to the effect, "I am not taking a bath with you." In response, Mr. Shigeta retorted, "yes, you will." Mr. Shigeta then went off into a separate area of the undressing room to get undressed, away from the rest of us.

19.  I turned to Mr. Rosen at that point, and complained about what was happening, and specifically about how uncomfortable I felt being required to take a bath in the nude with my boss.

20.  I also went over to Mr. Fidoten, by which point I was quite upset. I believe I said words to Mr. Fidoten to the effect of, "this is f_____ ridiculous, why do I have to take a bath with this nut?" In response to my complaint, Mr. Fidoten merely shrugged, and said "when in Rome . . . ."

21.  I later again complained to Mr. Rosen about this incident, namely, that I felt uncomfortable and humiliated, and felt that I had been manipulated and forced to take part.

22.  In or about May, 2006, I learned that Mr. Shigeta was planning another trip to Japan, and that on this trip he was planning to take another Dentsu employee, Neal Gomberg. During this period, Mr. Shigeta and I both happened to be at the office working late. I approached him about the anticipated trip to Japan, and I brought up the fact that he was taking Mr. Gomberg. I then specifically raised with him the experience I had had at the bathhouse, and I told Mr. Shigeta not to take Mr. Gomberg to the bathhouse.

I told Mr. Shigeta how humiliating and uncomfortable the experience had made me. I further told him that I was so angered by the experience that I had thought about complaining to human resources. At this point, Mr. Shigeta gave a little laugh, and then became quite serious, and said to me words to the effect that if I had complained, he would have fired me. Repeating himself but in the present tense, he then said words to the effect, "if you say anything about it, I will fire you." He then looked at me, pursing his lips together, and nodded his head vigorously several times. He then turned on his heels and walked away. This threat, which I took quite seriously, strongly discouraged me from making any further complaints about Mr. Shigeta.

23. I contend that my subsequent firing was directly related to the harassment, and my complaint to Mr. Shigeta about his harassing conduct.

24. Other than when Mr. Shigeta threatened to fire me for complaining in May, 2006 (and, I suppose, when Mr. Fidoten shrugged in response to my complaint at the bathhouse), I never received any response from anyone at Dentsu to any of my complaints regarding Mr. Shigeta's sexual behavior.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Steve Biegel

Executed on January **15**, 2008